HOBSON, Judge.
Petitioner, Board of County Commissioners of Pinellas County, acting as the governing authority of the Pinellas County Water and Navigation Control Authority (Authority), seeks a writ of certiorari to reverse the appellate order of the Circuit Court for Pinellas County which directed *787 that the Authority grant the revised private dock permit application of J. Scott Ford (Ford), respondent. We grant certiorari and reverse.
Ford owns a lot in the City of St. Peters-burg on a peninsula known as Maximo Moorings Unit Eighteen. The peninsula is bordered on the south by the approximately 200-foot wide Maximo Moorings Marina Channel (waterway) and on the north and west by Boca Ciega Bay. At the east end of the waterway is the Maximo Moorings Marina and at the west end is the bay.
Ford filed a private dock permit application with the Authority in mid-September, 1980, requesting permission to build a dock and boat-slip structure which would extend 70 feet into the waterway from the portion of the seawall bordering his upland lot. The Director of Public Works and Utilities, Gene Jordan, submitted a letter of objection on the basis that the proposed structure would constitute “an obstruction to navigation.” Ford filed a revised application in early October, 1980, requesting a permit for a dock and boat-slip structure which would extend 50 feet into the waterway.
After duly notifying all interested parties, the Authority held a public hearing on Ford’s revised application. The Authority’s Minutes Book and File reveal the following:
Speaking in opposition to the application, Victor Kauffman, dock master of the marina, noted that the southern edge of the waterway is not bordered by a seawall, as is the northern, and that, due to tides and currents, the boating channel within the waterway runs through the north side (Ford’s side) of the waterway. He stated that the proposed structure would present navigational problems. In support of his position, he remarked that the waterway is heavily traveled because the marina contains about 500 boat facilities and several boat businesses. Also, he presented photographs and a letter of objection from the marina’s master mariner.
Gene Jordan, with the aid of illuminated slides, compared Ford’s original 70-foot proposed structure with his revised 50-foot proposed structure. He emphasized that boat-slip tie poles in the waterway are generally situated 30 feet or less from the north seawall. Further, he stated that shoaling exists in the waterway.
Brian Curtis, a retired United States Coast Guard officer and owner of property on Ford’s side of the peninsula, concurred with Kauffman that the proposed structure would pose a hazard to boating safety. In support of his conclusion, he commented that many boats, some with 20 to 24-foot beams, transit the waterway. He observed that numerous individuals in small boats who use the waterway have little knowledge of boating skills. Also, he noted that the waterway is subject to shoaling, tides and currents.
Judd Beckoff, an owner of property on the southern side of the peninsula, stated that the waterway is one of the most heavily traversed in the City of St. Petersburg. He predicted that the proposed structure would create a dangerous bottleneck for boaters. Several other local property owners voiced opposition to the revised application. One local couple mailed in a letter of objection.
Ford’s attorney, speaking in support of the requested structure, observed that the proposed structure would leave open an 100-foot wide and 5-foot deep passageway, in conformity with the only plat restrictions on his client’s lot that he leave open a minimum 80-foot channel. He added that there would be a 4-foot depth at the end of the proposed dock at low tide which he said would ensure an absence of problems for large boats passing by.
Ford himself stressed that the proposed structure was in compliance with not only his lot deed restrictions, but also the Authority’s rules and the City of St. Peters-burg’s zoning ordinances. He submitted a petition containing the signatures of thirty local residents who favored the proposed construction.
The City of St. Petersburg had approved the revised application; the Authority’s engineering department had recommended approval of the revised application; and the *788 United States Army Corps of Engineers had considered the proposed structure reasonable. Also, the northern boat markers are 72 feet from the north seawall: 22 feet beyond the southern end of the proposed 50-foot structure.
At the conclusion of the hearing, the Authority decided to defer a decision on the matter of the application for a six-month period in order that concerned parties could impress upon the City of St. Petersburg its “responsibilities” to build a seawall on the southern edge of the waterway (in order to help prevent further shoaling) and to dredge the waterway.
Six months later, in April, 1981, the Authority resumed the public hearing. The minutes do not indicate whether the City of St. Petersburg in the interim had agreed to construct a southern seawall or to dredge the waterway. However, they show that the Authority’s engineering department now recommended a denial of the application based on the restrictive nature of the waterway and the hindrance to navigation which the proposed structure would create. Also, another local property owner appeared and stated that the proposed structure would be a hazard to navigation. But Joe Batchelor of the Army Corps of Engineers pointed out that the proposed 50-foot structure would be within the Corps’ guidelines which limit structures to not over one-quarter the width of a waterway in order to ensure safe navigation.
The Authority denied Ford’s application. The parties concede that it denied the application on the ground that the proposed structure would pose navigational problems. Ford appealed to the circuit court and presented a two-fold argument: first, that the Authority lacked the legislative authority to consider navigational problems as a factor in regulating dock construction; and, second, that the Authority’s denial on the ground that the proposed structure would interfere with navigation was not supported by competent substantial evidence. The court, after reviewing the Authority’s enabling legislation, chapter 31182, Laws of Florida (1955), rejected Ford’s first contention. However, after reviewing the evidence, it accepted his second assertion. Thus, it reversed the Authority’s denial and remanded with directions that the Authority grant the permit. The Authority now petitions from the court’s order that its denial was not based on substantial competent evidence. Ford, meanwhile, presents the same two arguments he asserted before the circuit court.
A review of the Authority’s enabling legislation leads us to reject Ford’s contention that the Authority lacks the authority to deny a private dock permit application based on navigational aspects. Section 2 of chapter 31182 reveals that the legislature created the Authority
[i]n order to provide for adequate regulation and control of all water, water courses, waterways . . . and to aid and assist boating activities and navigation

Section 18, meanwhile, as amended by chapter 72-664, Laws of Florida (1972), states that the provisions of the Act
shall be liberally construed in order to effectively carry out its purpose of protecting the public’s interest ....
In order to analyze Ford’s argument, it is necessary to examine sections 8 and 10. Section 8, as amended by chapter 72-664 and chapter 78-602, Laws of Florida (1978), states that persons and entities desiring to dredge, pump sand, extend lands, construct or extend islands creating obstructions in, on, or under any of the county’s navigable waters shall apply to the Authority for a permit. Subsection (e), denoted subsection (d)l by the 1972 changes, states that “in order to prevent undesirable situations” the Authority shall obtain data and hear testimony so as to determine, among other things:
a. The effect of the proposed plan or development on the use of said waters in said county for transportation and recreational or other public purposes and public conveniences.
b. The effect of the proposed plan or development on the free use of the waterways and navigable waters.
*789 Subsection (d)8 says that the Authority shall deny the permit application if it finds that the proposed plan or development adversely affects any of the rights or interests of the public.
Section 10, however, provides in whole [t]hat the aforementioned provisions of Section 8 shall not deny the right of any upland owner to construct a dock or wharf in front of his upland as provided by the laws of this state, but said Authority may make reasonable rules and regulations for the construction thereof in order to carry out the provisions and intent of this section.
Ford contends that the Authority lacks the authority to deny a dock application based on navigational criteria because section 10 says the Authority may establish rules and regulations “in order to carry out the provisions and intent of this section ” (emphasis Ford’s), but does not expressly provide that the Authority may consider “navigational aspects.”
The intent of section 10, which Ford does not attempt to define, cannot possibly be discerned by reading the section in a vacuum. In order to ascertain the intent of the section it is necessary to consider both the pronouncement in section 2 that the Authority’s purpose is to aid and assist boating activities and navigation and the statement in section 18 that the provisions of the act are to receive a liberal construction. Thus, we believe that the intent of section 10 is that the Authority may consider navigational aspects in regulating the construction of docks. We agree with the circuit court that “[t]o find otherwise would be to place a stilted and unduly restrictive interpretation on this Act.”
The Authority’s decision to deny Ford’s application on the ground that the proposed structure would pose a hindrance to navigation was supported by substantial competent evidence. The evidence was obviously in material conflict. On paper, it appears that the Authority could have easily granted the application. For example, the length of the proposed structure comports with the guidelines of the Army Corps of Engineers, Ford’s lot deed restrictions, and the City of St. Petersburg’s zoning ordinances. Also, the southern end of the requested structure is 22 feet from the northern channel markers. But Kauffman and Curtis, among others, concluded that the proposed structure would create navigational problems because the waterway is heavily traveled by large and small boats and is adversely affected by shoaling, tides and currents. Both appeared qualified to offer opinions: Kauffman being the dock master of the marina and Curtis being a former Coast Guard officer. We believe that their statements alone were “sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached.” DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla.1957).
Accordingly, certiorari is GRANTED, the order of the circuit court is REVERSED, and the cause is REMANDED with directions to reinstate the Authority’s decision.
OTT, C.J., and BOARDMAN, J., concur.